Filed 7/9/14  P. v. Gildo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ADALBERTO GILDO,<br><br>    Defendant and Appellant. | B248984<br><br>(Los Angeles County<br>Super. Ct. No. KA096065) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed.

Robison D. Harley, Jr. for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Adalberto Gildo, appeals his conviction for robbery, attempted robbery and petty theft, with principal armed and personal firearm-use enhancements (Pen. Code, §§ 211, 664, 484, 12022, 12022.53).[1]  He was sentenced to state prison for a term of 14 years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *Background.*

Beatris Cortez and defendant Gildo began dating in June 2011.  When they met, Gildo told Cortez he was a deputy sheriff.  Gildo also told Maria Torres, Cortez's sister, and Maria's husband, Hector, that he was a police officer.  In fact, he was not.

During 2011,[2] Gildo and Cortez were living with the Torres family in La Puente.  Gildo was given a key to the house.  Gildo owned a white and chrome nine-millimeter semiautomatic handgun, and Hector owned a black nine-millimeter Beretta handgun.  In late September or early October, Gildo and Hector went to a shooting range together and brought these guns with them.  Hector usually kept his gun locked inside a case in his bedroom; he kept one key to the case with him, but there was another key inside the house.

Cortez owned a silver 2005 Honda Accord, license plate number 5MRY591.  Both she and Gildo drove this car.  Miguel Rincon and Gildo were friends.  Rincon, who was paralyzed from the waist down, owned a red or burgundy Jeep Grand Cherokee (Jeep).  Rincon used paraplegic tools to drive the Jeep.

---

[1]    All further references are to the Penal Code unless otherwise specified.

[2]    All further date references are to the year 2011 unless otherwise specified.

b. *The Caddow incident.*

In September, Craig Caddow wanted to buy a car. He saw a posting on Craigslist advertising a silver Honda for sale. Caddow called the listed telephone number and spoke to a man who identified himself as Albert. They agreed on a price of $5,000 and arranged to meet the next day at the DMV office in Banning.

Rincon was with Gildo at the DMV office. After inspecting a Honda with license plate number 5MRY591, Caddow gave Gildo $4700 for it. But when they went into the DMV office, Caddow noticed the name on the pink slip was "Beatris." Gildo said this was his wife, who worked at Sears in the La Puente mall, an hour's drive away. They agreed to meet there so she could sign the title over to Caddow. Caddow drove the Honda to the mall with Gildo in the passenger seat. Rincon drove his Jeep. In the parking lot, Caddow left his briefcase, Blackberry and iPad in the Honda and started walking toward the mall with Gildo. But when he noticed Jonathan Navarette, Gildo's codefendant in this case, approach the Honda, Caddow went back to retrieve his belongings. Navarette got into the driver's seat of the Honda. When Caddow tried to prevent Navarette from closing the driver's door, Gildo yelled: "Don't fuck around. You're going to get shot." Caddow, who was a gun-owner, heard the sound of a round being chambered and saw Gildo sitting in Rincon's Jeep and pointing a semiautomatic handgun at him. Caddow let go of the driver's door and ducked behind another car. As the Jeep drove away, Caddow ran back to the Honda and tried to smash in the driver's window, but the Honda, also, drove away.

c. *The Tamimi incident.*

In October, Naser Tamimi posted a listing on Craigslist saying he wanted to buy a car for $1,000. He was contacted by man who identified himself as Sergio and said he was a police officer. Gildo, calling himself Sergio, met Tamimi in Bell Gardens to test-drive a 2005 silver Honda Accord, license plate number 5MRY591. Gildo showed Tamimi a law enforcement badge. The Honda's title showed it was registered to Beatris Cortez.

3

On October 20, Tamimi met with Gildo, Navarette and a third man, who was driving a burgundy car. Tamimi had brought $2,000 with him, which he showed to Gildo. They then drove to another location to complete the sale. At this second location, Navarette pointed a gun at Tamimi and told him to hand over the money. Tamimi fled, hid inside a store and called the police.

d. *The Cervantes incident*.

Also in October, Marco Cervantes posted an advertisement on Craigslist saying he wanted to purchase a car. He later spoke to Gildo, who called himself Mike. Gildo said he had two cars for sale, a 2005 Honda Accord and a 1992 Honda Civic. Cervantes was interested in the Civic. On the afternoon of October 24, Cortez saw Gildo looking at Craigslist on a computer. Gildo said he was going with a friend to sell the friend's Honda.

Cervantes arranged to meet Gildo that night. Gildo, Navarette and Rincon arrived in the two Hondas. After further negotiations, Cervantes gave Gildo $600. Navarette said the key was stuck in the Civic and would not come out. Then Navarette turned on the Civic and started to drive away. Cervantes, who had been standing next to the car, was thrown onto the sidewalk. Gildo and Rincon began to drive off in the Accord. Cervantes dove through the Accord's passenger window and grabbed the ignition key. Gildo got out and approached Cervantes with clenched fists. Gildo eventually threw Cervantes's money onto the ground. Cervantes grabbed the money and called the police, who impounded the Accord.

e. *Aftermath*.

Gildo told Cortez that, if she wanted to get her car back, she should report it to the police as stolen. Cortez did so, telling the police that Gildo was a deputy sheriff. Officers arrested Gildo and searched the Torres house. Maria Torres showed them her husband's gun in its locked case. The telephone numbers used to contact Caddow, Tamimi and Cervantes belonged to Gildo. All three victims identified Gildo at trial.

4

2. *Defense evidence.*

Navarette called Dr. Mitchell Eisen to give expert testimony on the functioning of eyewitness memory. Eisen explained how memory operates, the effect of traumatic stress on memory and the best methods for composing photo arrays.

## CONTENTIONS

1. The firearm-use enhancement finding must be reversed because of prosecutorial misconduct.

2. The firearm-use enhancement finding must be reversed because of ineffective assistance of counsel.

3. The firearm-use enhancement finding must be reversed because the trial court improperly admitted evidence showing Gildo lied about being a police officer.

4. The firearm-use enhancement finding must be reversed because of cumulative error.

## DISCUSSION

1. *There was no prosecutorial misconduct.*

Gildo contends the firearm-use enhancement finding must be reversed because there was prosecutorial misconduct during closing argument. This claim is meritless.

a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

5

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[C]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

b. *Asserting Gildo retrieved the gun from the back seat of Rincon's Jeep.*

Caddow testified Gildo pointed a gun at him from the back seat of Rincon's Jeep. There was no evidence Caddow had seen a gun before that time, and Caddow testified he and Gildo had earlier emptied out the Honda and placed all its contents into the Jeep.

During closing argument, the prosecutor stressed the evidence showing Gildo had gotten into the back seat of the Jeep: "That's very important. Why is he going to the back seat of the car? You're taking off with someone, aren't you going to just hop in the car? Most people don't get chauffeured around. Most people sit up in the front seat. [¶] He gets to the back seat where the gun is actually point[ed]." "Now, who went into the back seat? Testimony places the defendant in the back seat. He's going to the back seat and digging for something in the back seat." After the trial court overruled a defense objection, the prosecutor continued: "[Y]ou have the testimony of Mr. Caddow who says that he sees [Gildo] run to the back seat of the car. He pulls or

6

he's digging around. . . . [¶] . . . [¶] Defense argues that, well, it would be a little difficult for Mr. Gildo to carry a gun on him if he's just wearing . . . jeans and a T-shirt. Well, that's why he's going back to the Jeep."

This did not constitute prosecutorial misconduct. The prosecutor properly asked the jury to infer from the evidence that the gun was somewhere in the back of Rincon's Jeep, where Gildo retrieved it when Caddow tried to prevent Navarette from driving away in the Honda.

c. *Commenting on inconsistent defense argument.*

The prosecutor argued: "You have a gun in this situation, and you have Mr. Gildo who's been part and parcel of this entire scheme. What . . . is a little odd about defendant's argument . . . it kind of breaks down. . . . [A]s they argue it, Mr. Gildo didn't use the gun at all. Well, you know what? If you look at it that way, Mr. Gildo would actually be not guilty of a robbery in that situation. But that doesn't sound too satisfying to people . . . when they're conceding one point on a case. Because, if Mr. Gildo didn't use the gun in that situation . . . there would be no force that would have been applied. The only – "

After defense counsel objected this misstated the law on accomplice liability, the trial court reminded the jury to consult the instructions and then the prosecutor continued: "The question . . . is did Mr. Gildo use force? You can look at it as an aider and abettor or as a perpetrator. And that's clear. You have the instructions as to that. It's possible you can look at it in either way and find him guilty as to either one. But, if he didn't actually use force, think about that for just a second. If he's not the one who's applying force in that first situation, you have the aiding and abetting instruction to fall back on for the robbery itself. [¶] And I guess counsel is then saying, well, then he was principal armed as well because Mr. Rincon had the gun. That's the argument they're making. But how did he know that everything would break down in this fashion?"

7

Gildo fails to explain how this argument amounted to misconduct. Following defense counsel's objection, and the trial court's direction for the jury to follow the instructions, the prosecutor acknowledged Gildo could be convicted of robbery if the gun had been wielded by an accomplice.

d. *Throwing the defense a bone.*

Gildo contends the prosecutor committed misconduct by characterizing defense counsel's closing argument as asking the jury to throw the defense a bone: "Ladies and gentlemen, really, defense is conceding everything but the gun and just asking you . . . to throw him a bone because . . . everything connects Mr. Gildo to the crime. And so what happens is they're trying to pick something and say, 'You know what? We're gracious. We understand that the evidence shows my client beyond a reasonable doubt did all these things. Just throw him this last bone that there was not a gun there.' But that's not what the testimony is. You have to look at the testimony in this case. What Mr. Caddow saw as he described it. Remember, he has [*sic*] circumstantial evidence as to hearing the gun."

There was no defense objection to these comments. Moreover, there was nothing improper. The prosecutor was merely pointing out there was no factual basis in the record for defense counsel's argument the jury should reject the personal firearm use allegation. The reference to throwing the defense a bone was "no more than sarcastic hyperbole." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1303, fn. 48.)

e. *Gildo as the mastermind.*

The prosecutor argued Caddow had testified "there was a gun that was pointed directly at him. There was a statement made about getting shot. There was the slide of a gun. And [Gildo's] the one who actually went to the back seat [i.e., of Rincon's Jeep]. [¶] Now, put this into a broader context when you look at all of the crimes themselves. Who's the person who is pretty much . . . the head of all three of these crimes? Who's the person who is contacting the individuals? The person who is leading the whole operation? It's Mr. Gildo. He's the one who makes the calls,

8

negotiates, gets the people there. He lures them in. And, when things go wrong, he's the one who goes for the gun on the first time. Second time he has someone else go with him and do it. But he's the one who knows exactly what's going on because he's the one who's planning it."

The trial court overruled defense counsel's objection that the prosecutor was misstating the testimony, and on appeal Gildo does not explain why this was incorrect or how the prosecutor's argument constituted misconduct.

f. *Asserting Gildo could have called Rincon as a witness.*

Defense counsel argued to the jury that, if a gun had been used during the robbery of Caddow, it was more likely to have been Rincon, rather than Gildo, who had the gun. In response, the prosecutor argued the defense could have called Rincon as a witness, saying: "He's the next logical witness in that situation." Defense counsel objected and the trial court agreed the prosecutor should not have said this because Rincon was unavailable to testify, telling the jury: "Mr. Rincon was unavailable to both sides in this case. So you are to disregard any suggestion that one party or the other should have called him." Gildo contends the prosecutor's statement about Rincon was prejudicial misconduct despite the trial court's admonition to the jury.

But the trial court's ruling was incorrect. "A witness becomes 'unavailable' on self-incrimination grounds, and thus immune from comment on his absence for that reason, only when his actual sworn assertion of the privilege has been upheld by the trial court, or the parties stipulate to his unavailability, or the defendant otherwise 'satisf[ies] the court that the witness cannot be called or that in the circumstances of the case an adverse inference should not be drawn from the failure to call [the] witness.' [Citation.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1216, fn. 9.) It was not improper for the prosecutor to call attention to Gildo's failure to call Rincon.

9

g. *Description of Gildo's threat to Caddow.*

Caddow testified Gildo yelled at him: "Don't fuck around. You're going to get shot." During closing argument, the prosecutor told the jury: "And, when you look at the case as a whole . . . it's not just a coincidence. It's the defendant committed all of these crimes, and I ask that you . . . find that the defendant personally used a handgun because you heard Mr. Caddow hear it, see it, and you had the defendant's own statement saying, 'Don't turn around. Don't fuck around *or I'll shoot*.' " (Italics added.) Following a defense objection, the trial court instructed the jury: "[T]here may have been misstatements relating to the statement attributed to Mr. Gildo relating to what was stated to Mr. Caddow in terms of a gun. I'll just ask you to check your notes, make sure you are all in agreement as to the precise wording of Mr. Caddow's testimony relating to that; and, again, if necessary, the court reporter's transcript is available to you."

In denying Gildo's new trial motion, the trial court concluded there had been no prosecutorial misconduct: "There was a misstatement in the prosecution's argument as to the precise words. Those characterizations do not appear as an attempt to verbatim identify what was said but is a fair characterization of the gist of the remark 'Don't fuck around or you're going to get shot,' and you're looking at the person that you testified to had the gun. Fair implication of that statement is precisely what the prosecutor indicated."

Given the jury instructions saying attorney comments did not constitute evidence, and the trial court's admonition to jurors to check their notes and ask for a readback if necessary, we cannot see that the jury would have been prejudiced by the prosecutor's misquotation.

2. *There was no ineffective assistance of counsel.*

Gildo contends the firearm-use enhancement must be reversed due to ineffective assistance of counsel. This claim is meritless.

10

a. *Legal principles.*

"In *People v. Fosselman* (1983) 33 Cal.3d 572 . . . , the Supreme Court established for the first time that 'in appropriate circumstances' the issue of trial counsel's effectiveness should be presented to the trial court on a motion for new trial, even though the new trial statute (Pen. Code, § 1181) does not include this as one of the enumerated grounds for the motion. [Citation.] [¶] It has been stated often that a motion for new trial is addressed to the sound discretion of the trial court and that its decision will not be reversed unless a clear abuse of discretion is shown. [Citations.] While this rule undoubtedly is correct in the context of a statutory motion for new trial, the proper scope of review of the trial court's ruling on a nonstatutory motion based upon an allegation of denial of constitutional rights is not so simple. We find the analogy to the procedures on motions to suppress evidence pursuant to Penal Code section 1538.5 compelling, and we hold that a similar two-step process is appropriate in these cases. [¶] In the first step, the trial court must find the relevant facts . . . . On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences. The trial court's factual findings, express or implied, will be upheld if they are supported by substantial evidence. [Citation.]" (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724.)

"In the second step of the process, the trial court will have decided whether, on the facts which it has found, the defendant was deprived of his right to adequate assistance of counsel, that is, whether the defendant has shown that . . . 'his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. [Citations.]' [Citation.] . . . [¶] To the extent that these are questions of law, the appellate court is not bound by the substantial evidence rule, but has ' "the ultimate responsibility . . . to measure the facts, as found by the trier, against the constitutional standard . . . ." [Citation.] On that issue, in short, the appellate court

11

exercises its independent judgment.' [Citations.]" (*People v. Taylor, supra,* 162 Cal.App.3d at pp. 724-725; accord *People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225, fn. 7 [it is proper to review denial of new trial motion de novo when claims of constitutional magnitude are raised].)

"Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  [Citation.]  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'  [Citation.]  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674].)

    b.  *Discussion.*

        (1)  *Failure to argue lesser included enhancement.*

Section 12022.53, subdivision (b), provides:  "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) [which includes robbery], personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply." Section 12022, subdivision (a)(1), provides, in pertinent part, that "a person who is armed with a firearm in the commission of a felony or attempted felony shall be

12

punished by an additional and consecutive term of imprisonment . . . for one year, unless the arming is an element of that offense.  This additional term shall apply to a person who is a principal in the commission of a felony or attempted felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm."

The jury was instructed on both enhancements and found them both true.  Gildo contends defense counsel should have requested an instruction specifically telling the jury the non-vicarious aspect of the section 12022 enhancement for arming is a lesser included enhancement of the section 12022.53, subdivision (b), enhancement for firearm use.  (Cf. *People v. Majors* (1998) 18 Cal.4th 385, 410-411 [indicating section 12022 (arming) is lesser included enhancement of section 12022.5 (firearm use)].)  Gildo asserts that in the absence of such an instruction, "the jury was forced into an all-or-nothing choice on the gun use enhancement."  He argues:  "[Because] [t]he vicarious liability component of [section 12022] was never challenged . . . the defense was conceding the one year gun enhancement pursuant to [section 12022] anyway."

We disagree with Gildo's assertion defense counsel's strategy was irrational.  Given the trial evidence, defense counsel reasonably decided to concede Caddow had seen a gun, while challenging his testimony the gun had been in Gildo's hand.  Gildo fails to see this strategy stood to gain a substantial benefit without any downside.  Convincing the jury the gun had been in Rincon's hands would have saved Gildo from the 10-year section 12022.53 use enhancement, while the one-year section 12022 arming enhancement would almost certainly have been imposed anyway.  That is, the jury would have reasoned if Gildo did not have the gun then Rincon did, and Gildo would therefore be liable under the vicarious principal-armed provision of section 12022.

13

Defense counsel's plan to try for an acquittal on the much more severe section 12022.53 enhancement did not constitute ineffective assistance of counsel.

(2) *Failing to request sanctions for destruction of evidence.*

A surveillance camera mounted on a Sears store caught portions of Caddow's robbery in the mall parking lot, but the CD on which the video was recorded had been accidentally destroyed by the Sheriff's Department. Gildo contends defense counsel was ineffective for not asking the trial court to sanction the prosecution with some sort of jury instruction relating to the section 12022.53 firearm-use enhancement. The trial court determined there was no error because it appeared this surveillance video would not have been exculpatory.

" 'The applicable law is . . . found in . . . two . . . United States Supreme Court decisions. In *California v. Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528], the high court held: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Fn. omitted.) [¶] More recently, in *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 289, 109 S.Ct. 333], the court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ' [Citation.] This court has expressly adopted the high court's holdings in *Trombetta* and *Youngblood*." (*People v. Zapien* (1993) 4 Cal.4th 929, 964.)

" 'It is settled that trial courts "enjoy a large measure of discretion in determining the appropriate sanction that should be imposed" because of the failure to preserve or destruction of material evidence. [Citations.]' [Citations.]" (*People v. Memro* (1995) 11 Cal.4th 786, 831.)

14

Here, the trial court found no ineffective assistance of counsel because Caddow's testimony showed the video lacked any significant evidentiary value. Caddow described having viewed the video: "Off of the corner of the Sears up high, there's a small video camera, and it spins in circles. And so the video was not great. You . . . definitely couldn't make out faces. You could just see a scene. And so you could see us get out of the car. You saw the cars parked. And then the video goes away for about 15, 20 seconds, and then it comes back; and you see me pounding on the window and take a flying jump at it and then disappears again. And then the next time it comes back about 15 spaces down the row and the cars are gone. Basically, worthless."

The trial court commented that, although it had struck the portion of Caddow's testimony in which he characterized the video as "worthless," that characterization was still relevant to the ineffective assistance of counsel claim. Discussing the *Trombetta* requirements, the trial court said Caddow "testified himself that the tape could not help him in terms of identifying the faces and, also, that the tape failed to reveal or to show things that he himself had personally observed. [¶] The testimony before this jury showed a lack of evidentiary value of that tape. It shows that the unavailability was not intentional, not necessarily grossly negligent, negligent perhaps, but perhaps best described as inadvertent." "The court is of the view that even if an instruction had been given, the outcome would not have been affected."

We agree there was no ineffective assistance of counsel in this situation.

(3) *Failure to ask expert witness hypothetical question.*

Gildo argues: "In spite of all the identification information from the defense expert, counsel never asked a hypothetical question which closely tracked Caddow's testimony about his split second glimpse under stressful conditions of what he thought was a barrel of an undescribed gun pointed in his direction from behind a rear window of a Jeep speeding away. [¶] A lengthy fact specific hypothetical question . . . would

15

[have] dramatically underscore[d] the weakness in Caddow's testimony about seeing a gun."

When he was asked about this during the hearing on Gildo's new trial motion, defense counsel said he had given consideration to just such a fact-specific hypothetical, but decided against it: "The biggest reason was made [*sic*] during the course of the trial, and I was watching very specifically the reactions of the jurors to the eyewitness identification expert. In this specific case, and I haven't seen it happen a lot, the reactions of the jurors were particularly bad. There were several jurors shaking their head[s] whenever he spoke, refusing to even look at the eyewitness identification expert while he was speaking. . . . [¶] After sitting and watching their reactions, I decided . . . that going into hypothetical[s] or going further on these issues was not going to be effective in convincing the jury as to the questions regarding eyewitness identification."

The trial court confirmed defense counsel's observations: "As far as the eyewitness expert, I personally recall Mr. Eisen's testimony in certain areas; and, although he is on the approved list of experts, his presentation in this case was not well received. If I recall correctly there was a chuckling of jurors at times during the testimony. But, more importantly, both attorneys in this case brought out the fact[s] and circumstances that can affect the accuracy of an identification."

Gildo challenges defense counsel's explanation, arguing "the record shows that the expert's testimony consumed 50 pages of report's transcript on direct examination by the defense," which "impeaches counsel's assertion that he chose not to examine further because of his perception that the jurors were reacting negatively to the expert." But Gildo is confused. As the Attorney General points out, it was codefendant Navarette who called this expert witness and who conducted a lengthy direct-examination. Gildo's attorney asked only a few questions.

There was no ineffective assistance of counsel here.

16

(4) *Failure to object to gun evidence.*

Gildo complains trial counsel failed to object to evidence about two guns, neither of which was ever shown to have been the gun used in the robberies. One was Gildo's own gun which he took to the shooting range; the other was Torres's gun, which was locked inside a case in Torres's bedroom. Gildo argues defense counsel should have objected to this evidence.

There was no ineffective assistance of counsel, however, because any objection would have been properly overruled. As *People v. Riser* (1956) 47 Cal.2d 566, disapproved on other grounds by *People v. Chapman* (1959) 52 Cal.2d 95, 98, held: "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. . . . When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser, supra,* at p. 577.)

Evidence showing Gildo possessed or had access to a weapon that could have been the one used in robbing Caddow was relevant and admissible under *Riser*. Caddow described the gun as a silver or black semiautomatic handgun. The disputed evidence showed Gildo possessed a white and chrome semiautomatic handgun, and that Hector Torres owned a black semiautomatic handgun to which Gildo had access. Either gun could have been used in the robberies.

3. *Admission of evidence that Gildo misrepresented himself as police officer.*

Gildo contends the trial court erred by admitting evidence he lied about being a police officer. This claim is meritless.

Over Gildo's objection, evidence was admitted showing he told various people he was a member of law enforcement. The trial court instructed the jury: "[E]vidence was admitted indicating that defendant Adalberto Gildo had represented himself to

17

others that he was a deputy sheriff or police officer. That testimony was received only for the limited purpose of determining whether that testimony tends to identify the defendant as a participant of any of the charged crimes. You may consider that evidence only for that purpose and for no other."

Gildo contends this evidence should have been excluded because identity was not an issue in the case. He argues he had been positively identified by all three victims and, as a result, "[t]hroughout the trial, the only issue was the gun use and identity was a non-issue."

By pleading not guilty, however, Gildo put identity in issue. (See *People v. Cowan* (2010) 50 Cal.4th 401, 476 ["defendant's not guilty plea put in issue all of the elements of the charged offenses, including the elements he conceded"].) Moreover, and contrary to Gildo's suggestion, identity was a disputed issue to at least one of the victims because Tamimi initially testified the person who identified himself as Sergio was not present in the courtroom. As the Attorney General points out: "Particularly under these circumstances, appellant's practice of telling people that he was a police officer or a deputy sheriff was relevant to corroborate Tamimi's eventual identification in court of appellant as 'Sergio,' the man who told Tamimi that he was a police officer."

4. *There was no cumulative error.*

Gildo contends that, even if harmless individually, the cumulative effect of these claimed trial errors mandates reversal of his convictions. Because we have found no errors, his claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



KITCHING, J.



ALDRICH, J.